UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

00 APR 13 PM 2: 18

U.S. DISTRICT COURT
N.D. OF ALABAMA

GARY JOE McILLWAIN,  )
　　　　　　　　　　　 )
　　　Plaintiff,　　　 )
　　　　　　　　　　　 )
vs.　　　　　　　　　 )  Civil Action No. CV-98-S-2696-NE
　　　　　　　　　　　 )
CITY OF SCOTTSBORO, ALABAMA, )
a municipality; SCOTT WHITED, )
an individual; and KEITH )
SMITH, an individual, )
　　　　　　　　　　　 )
　　　Defendants.　　 )

**ENTERED**

APR 1 3 2000

### MEMORANDUM OPINION

Plaintiff commenced the present action alleging that defendant Scott Whited, a police officer for the City of Scottsboro, Alabama "shoved him in the back so as to cause him to strike the commode and floor and do damage to his body while he was being placed in a cell at the City of Scottsboro jail." (Complaint at 2-3, ¶ 6.) Plaintiff seeks damages under 42 U.S.C. § 1983 for a violation of the Fourteenth Amendment to the United States Constitution, and the common law of Alabama for assault and outrage. The action is before the court on defendants' motion for summary judgment. For the reasons set forth below, the court finds the motion is due to be granted in part and denied in part.

### I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if



the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.)  The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial.  *See Celotex Corp. v. Catrett* , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc*., 929 F.2d 604 (11th Cir. 1991).  The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case.  *Jeffery v. Sarasota White Sox, Inc*., 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.  When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *See Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence

presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Inferences in favor of the non-movant are not unqualified, however.  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence <u>could</u> draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).  A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II.   FACTUAL BACKGROUND

Plaintiff was arrested by Officer Whited close to midnight on November 11, 1996, for driving under the influence of alcohol.[1] Plaintiff is not certain about the quantity of alcohol he had consumed before he was stopped, but admits to having shared a pint of Jack Daniel's whiskey with his cousin, Thomas Herford.[2]  When the men ran out of liquor, plaintiff got into his girlfriend's 1982 Toyota Celica, and started driving to his girlfriend's house, approximately 3 miles away.[3] Plaintiff admits he had a "good buzz going," and felt a "little" too impaired to drive a vehicle.[4] Officer Whited stopped plaintiff along that route, and asked to see his driver's license.  Plaintiff could not produce one; his driving privileges had been revoked or suspended due to numerous DUI

---

[1] Plaintiff's deposition at 63-64; Whited's deposition at 6.)

[2] Plaintiff's deposition at 53.

[3] *Id*. at 43, 59.

[4] *Id*. at 58.

4

convictions.[5]  Officer Whited then asked plaintiff to take a field sobriety test, but he refused.[6]  Plaintiff accordingly was arrested, handcuffed, and placed in the back of Officer Whited's patrol car.[7]

At the time of plaintiff's arrest, Officer Whited had been employed with the City of Scottsboro for only one month.[8]  He had almost five years of prior experience as a police officer, however, beginning in 1992 as a reserve officer for the City of Hollywood, Alabama, and continuing as a police officer for the City of Bridgeport, Alabama, from 1992-1996.[9]  As a consequence, together with the fact that Whited already was a certified police officer,[10] the City of Scottsboro did not provide Whited extensive training prior to hiring him.[11]  Additionally, Whited's had not been

---

[5] *Id.* at 27, 57.

[6] *Id.* at 62.

[7] Whited testified that plaintiff cursed him while the handcuffs were being applied.

> [W]hen I arrested him and placed him in handcuffs ... he jerked away and told me to get my fucking hands off of him that he would get himself in the car.  I let go of his arm, told him to watch his head as he sat down because it was a tight fit.

Whited's deposition at 18.  In contrast, plaintiff denies that he cursed Whited, and claims that he voluntarily sat in the back of Whited's patrol car. Plaintiff's deposition at 66.

[8] Whited's deposition at 68.

[9] *Id.* at 21-22.

[10] If an officer is "certified" it means he has successfully completed the police academy.  *Id.* at 72.

[11] Whited did ride with two other Scottsboro officers during his first week

5

disciplined in his previous positions, although he had received one written warning for accidental discharge of a firearm.[12]

Officer Whited was given a copy of the Scottsboro Police Department's policy and procedure manual when he was hired.[13]  That manual establishes that officers "shall not use unnecessary force or violence in making an arrest or dealing with a prisoner or any person."[14]  It also establishes a code of conduct for dealing with persons detained in the city jail:

> All prisoners confined in the city jail shall be treated
> with utmost kindness and consideration, compatible with the
> enforcement of policy and procedures necessary to compel
> obediance [sic] to the member or civilian employee in
> charge.[[15]]

Officer Whited transported plaintiff to the City Jail.[16]  They arrived shortly after midnight and Shane Clark, a jailer for the City of Scottsboro, assisted Officer Whited in escorting plaintiff into the jail.[17]  Plaintiff was first taken into the booking room, where he was photographed and fingerprinted, and then to the room in which persons arrested for DUI were tested for blood-alcohol

---

of employment to assist him in learning the street names in the area.  *Id.* at 69-71.

[12] *Id.* at 74; Smith's deposition at 29.

[13] *Id.* at 11-12; Whited's deposition at 69.

[14] Plaintiff's exhibit A. at 21.

[15] *Id.* at 30.

[16] Whited's deposition at 7-8.

[17] *Id.* at 13.

content through use of equipment known as an "intoxilyzer."[18] Officer Whited read plaintiff a copy of Alabama's implied consent law,[19] but plaintiff refused to submit to the intoxilyzer test procedures.[20]  Plaintiff contends that Whited "kept trying to get me to take [the test] and I kept telling him I didn't want to take it and I did cuss him."[21]

Officer Whited and Jailer Clark then escorted plaintiff to the "drunk tank."[22]  They were followed by Sergeant Jim Keller, the shift supervisor, and another jailer, Denise Fountain.[23]  Fountain unlocked the cell door, and stepped back into the hallway, along with Sergeant Keller, to provide ample room for Whited and Clark to place plaintiff in the cell.[24]  The events that occurred next are disputed and, accordingly, this court accepts plaintiff's version. He says that Whited unlocked the handcuffs and pushed him into the cell with such force that he fell against the steel commode and fractured three ribs.  Plaintiff testified:

---

[18] Whited's deposition at 27-29; plaintiff's deposition at 73-76.

[19] *See* Alabama Code § 32-5-192 (1975).

[20] Whited's deposition at 29-30; plaintiff's deposition at 76.

[21] Plaintiff's deposition at 78.

[22] *Id*. at 83; Whited deposition at 30-31.

[23] Although plaintiff has denied that all of these officers were present when he was placed in a cell, for the purposes of this motion, he adopts defendants' version of the facts, because they are more favorable to him. (Plaintiff's response ¶ 9.)

[24] Fountain's deposition at 20-21.

A.    I was cussing a little....

Q.    Were you loud, cussing loudly?

A.    I mean I wasn't yelling, screaming or nothing.   I
      guess it's loud in a jail.  It kind of echoes.

Q.    Were they saying anything back to you?

A.    No.

Q.    They didn't say anything like shut up or I'm going to
      knock the crap out of you?

A.    No.

Q.    So tell me what happened as ... you're approaching the
      cell....

A.    I was standing in the front of the door.  It was open and
      Officer Whited took the handcuffs off and he just pushed
      me as hard as he could.

Q.    He took the handcuffs off so both of them were off?

A.    Yes, sir.

Q.    And then he pushed you?

A.    Yes, sir.

Q.    Were you facing the cell or were you facing Officer
      Whited?

A.    The cell.

Q.    So he pushed you in the back?

A.    Yes, sir.
...
Q.    And you were intoxicated.  Did you lose your balance
      when he pushed you?

8

A.      Yeah.

Q.      When he took the handcuffs off, you were struggling, weren't you?

A.      No, sir.

Q.      You tried to twist around?

A.      No, sir.

Q.      Swing your arms around?

A.      No, sir.

Q.      Try to hit him?

A.      No, sir.

Q.      You were still threatening and cussing at him.

A.      At that point I wasn't.

Q.      Oh, you just immediately stopped when they ——

A.      Yes, sir.

Q.      So you didn't say anything else from the second he stood you in front of the cell?

A.      No, sir.

...

Q.      Did he shove you hard?

A.      Extremely hard.

Q.      And did you not take a step forward when he pushed you?

A.      I was in the process of taking a step forward when he pushed me.

Q.      When he took the cuffs off you, you grabbed the jail

9

```
              bars, didn't you?

A.            No, sir.
...
Q.            When he tried to take the cuffs off, you had your
              fists clinched real tight so he couldn't take the
              cuffs off, didn't you?

A.            No, sir.[25]
```

Plaintiff contends that he was in excruciating pain after falling

into the toilet,[26] and that he asked for help, but the officers

ignored him and walked out of the cell block.[27] Plaintiff estimates

that it was an hour and a half before anyone checked on him.

> Well, I just laid there ... hollering and screaming for help
> for somebody to come back there.  And after probably an hour
> and a half or so Ms. Fountain come back there and looked at
> me still laying in the same position and she went back up
> front and said:  He needs help.[28]

Officer Whited admits that he pushed plaintiff into the cell,

but argues that force was necessary, because plaintiff had been

threatening him and struggling against being placed in the drunk

tank.[29]

---

[25] Plaintiff's deposition at 86-92.

[26] *Id.* at 99.

[27] *Id.* at 100.

[28] *Id.* at 101.

[29] Specifically, Officer Whited contends that plaintiff "had his fists
clinched up and it looked to me like — and the way he was acting and making his
threats and talking about kicking my ass and the other threats he was making that
he was ... attempting to turn around and try to hit me or Officer Clark...."
Whited's deposition at 39-40.  Officer Whited denies, however, that plaintiff
fell against the commode, and contends that he witnessed plaintiff land on his
buttocks, in the middle of the cell.  *Id.* at 44.  Whited also contends that
plaintiff did not show any indication of being injured by the fall.  *Id.* at 66.

Sergeant Keller transported plaintiff to the hospital, and he was treated in the emergency room at 2:50 a.m.[30]   The hospital confirmed that plaintiff had three fractured ribs, and his treating physician wrote him a prescription for pain medication.[31]   Sergeant Keller took plaintiff back to jail around 6:00 a.m.   Plaintiff asked Fountain to reach into his pants pocket and retrieve his prescription for pain medication, because he was hurting so badly that he "couldn't twist, move or do nothing."[32]   Fountain refused to do so, but did send a male officer to retrieve the prescription.[33]   Plaintiff's girlfriend got the prescription from the officer and filled it,[34] and plaintiff was released from jail at 7:30 a.m.[35]

---

Additionally, Fountain alleges that she checked on plaintiff every ten to fifteen minutes after he was placed in the drunk tank. *See* Fountain's deposition at 28-40.  The first time Fountain observed plaintiff, he was still sitting on the floor, "cursing and wanting out."  *Id.* at 29.  The second time, at approximately 12:45 a.m., plaintiff told Fountain that he was in pain.  *Id.* at 32.  Plaintiff told Fountain that "he was standing up on the edge of the toilet and he fell and he knew he broke some ribs."  *Id.* at 34.  Plaintiff asked Fountain for some Tylenol, and she gave him some around 1:00 a.m.  *Id.* at 37-8.  According to Fountain, plaintiff then went to sleep, and did not wake until 2:30 a.m., at which time he requested to be taken to the hospital.  *Id.* at 40.

[30] Plaintiff's brief ¶ 5 (citing plaintiff's exhibit I); Fountain's deposition at 42 (stating that Sergeant Keller and plaintiff left the jail at approximately 2:40 a.m.).

[31] Plaintiff's exhibit I.

[32] Plaintiff's deposition at 115-117; Fountain's deposition at 46.

[33] Plaintiff's deposition at 116-117; Fountain's deposition at 46.

[34] Plaintiff's deposition at 116.

[35] *Id.* at 117.

### III.   DISCUSSION

### A. Plaintiff's Fourteenth Amendment Claims

Plaintiff alleged numerous violations of the Fourteenth Amendment by Officer Whited and Keith Smith, Chief of the Scottsboro Police Department, and seeks damages from them and the City they serve under 42 U.S.C. § 1983.   Defendants Smith and Whited argue that plaintiff's claims against them are barred by the doctrine of qualified immunity.

Section 1983 creates a private right of action for damages and injunctive relief against individuals and governmental entities whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes.[36]   In actions bottomed upon section 1983, governmental officials performing discretionary functions may avoid liability when sued in their individual capacity by showing entitlement to "qualified immunity."

---

[36] 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.   For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

"Government officials performing discretionary functions are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hartley v. Parnell*, No. 98-6829, 1999 WL 979614 at *3 (11th Cir. Oct. 28, 1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

Qualified immunity is much more than simply a defense to liability; indeed, the doctrine "provides the right not to be burdened by trial." *Tinney v. Shores*, 77 F.3d 378, 380 (11th Cir. 1996). Moreover, the doctrine is construed broadly. It "gives ample room for mistaken judgments by protecting all but the plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (internal quotations omitted).

The burden placed on a plaintiff opposing a qualified immunity defense is onerous.

A plaintiff must establish more than broad legal truisms; he or she must demonstrate that the law fixed the contours of the right so clearly that a reasonable official would have understood his acts were unlawful. ... Thus, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the

13

circumstances." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994)(*en banc*). Moreover officials need not "'be creative or imaginative in drawing analogies from previously decided cases.'" *Id.* at 1150. (citations omitted).

*Dolihite v. Maughon*, 74 F.3d 1027, 1040-41 (11th Cir.), *cert. denied*, 519 U.S. 870, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996).

The Eleventh Circuit has framed the qualified immunity standard as follows:

Once a defendant advances a defense of qualified immunity, he is entitled to summary judgment unless "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions...." *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed. 411 (1985). "The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms...." *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir. 1986). The Supreme Court has stressed that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

An official will be immune if "the law with respect to [his] actions was unclear at the time the cause of action arose" or if "'a reasonable officer could have believed ... [his actions] to be lawful, in light of clearly established law and the information ... [the officer] possessed.'" *Clark v. Evans*, 840 F.2d 876, 879-80 (11th Cir. 1988)(quoting *Anderson v. Creighton*, 107 S.Ct. at 3040). For purposes of qualified immunity, an abstract mandate to act "with care" or "reasonably" is too vague; "generalities are just not

14

helpful." *Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir. 1987); *see Clark v. Evans*, 840 F.2d at 881, 882 (proper inquiry is "fact-specific"; officer who shot and killed fleeing prisoner immune because "[n]o case ha[d] expressly held that an officer has to first shoot to maim before shooting to kill"). In sum, "the qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed. 271 (1986).

*Edwards v. Gilbert*, 867 F.2d 1271, 1273 (11th Cir. 1989).

The Eleventh Circuit defines the district court's inquiry on a motion for summary judgment asserting qualified immunity as follows:

> [T]he relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred.

*Stewart v. Baldwin County Bd. of Education*, 908 F.2d 1499, 1503 (11th Cir. 1990).[37]   Because plaintiff's claims against each defendant are grounded upon separate factual allegations, the court

---

[37] The Supreme Court has also elaborated on the district court's role at the summary judgment stage in noting that:

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

*Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (footnote omitted).

will examine them separately.

1.    **Excessive force claims**

a.    **The City of Scottsboro and Chief Smith**

Plaintiff alleges in Counts I and II of his complaint that the City of Scottsboro and Chief Smith failed to:  investigate and hire responsible police officers; adequately train and supervise city employees; inspect, monitor, and supervise the city jail; provide for the safety and welfare of inmates; prevent an alleged assault on plaintiff; and promulgate, institute, and follow rules, regulations, protocols, practices, and guidelines for the supervision  of those persons arrested, transported and housed as inmates in the city jail.  Defendants argue that these claims are due to be dismissed in their entirety, because plaintiff has failed to identify any policies, customs, or practices of the City or its Chief of Police which are alleged to have resulted in a constitutional violation.  Defendants also argue that "there is absolutely no evidence that any of these factors contributed to or caused the injuries of which the plaintiff complains."[38]  The court agrees.

A municipality may not be sued under § 1983 on a respondeat superior theory.  *See Monell v. Department of Social Services of*

---

[38] Defendants' brief (doc. no. 18) at 16.

*New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed. 2d 611 (1978).  Rather, a municipality is liable only if the plaintiff shows that a "custom"[39] or "policy"[40] of the municipality was the "moving force" behind the constitutional deprivation.  *Id.*  Here, plaintiff has submitted portions of the Scottsboro policy and procedures manual, but has failed to specifically identify any policy statements that promoted, or encouraged Officer Whited to use excessive force when placing plaintiff into his cell.  Instead, plaintiff relies on policies contained in the manual to support his argument that Whited's use of force was unauthorized by the City of Scottsboro and its police department:

> The Scottsboro Police Department policy and procedure manual noted that police officers shall not use unnecessary force or violence in making an arrest or dealing with a prisoner. It further noted that police officers shall not strike or use any form of physical force on a prisoner except when necessary to prevent his escape from custody of a person whom the officer has reasonable cause.  As to the treatment of the prisoner, the policy and procedure manual provided that all prisoners housed in the Scottsboro City Jail shall be treated with the upmost kindness and consideration which was compatible with the policies and procedures to compel obedience to police officers.[41]

---

[39] "A custom is a practice that is so settled and permanent that it takes on the force of law."  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (citing *Monell*, 436 U.S. at 690-91, 98 S.Ct. at 2035-36).

[40] The Eleventh Circuit has defined a policy as "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."  *Id.*

[41] Plaintiff's brief (doc. no. 20) ¶ 6).

Thus, plaintiff has failed to establish that his injuries occurred as a result of a city policy, and this claim against the City of Scottsboro accordingly is due to be dismissed.

A city may be liable under § 1983 for inadequate hiring and screening policies. *See Board of County Commissioners v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Such a claim will lie, however, "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right...." *Brown*, 520 U.S. at 411, 117 S.Ct. at 1392. In *Brown*, the Supreme Court held that the county was not liable for an officer's use of excessive force, even though at the time the sheriff hired the officer, he had a lengthy criminal record, including convictions for assault and battery, resisting arrest, and public drunkenness. The Court concluded:

> [A] finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict constitutional injury. Rather, it must depend on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong.

*Id*. at 412, 117 S.Ct. at 1392 (emphasis supplied). In the present

case, the City of Scottsboro investigated Officer Whited's background prior to hiring him, and discovered that previous employers had not taken any disciplinary action against him. Although Officer Whited had received a written warning for accidental discharge of a firearm, such an incident would not have provided the City with any basis from which to conclude that a "highly likely" consequence of hiring Whited would be the specific constitutional violation alleged here. Accordingly, this claim also is due to be dismissed.

Municipal liability may also be based on proof that a city insufficiently trained its employees. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To establish such a claim, plaintiff must prove, first, that Scottsboro "in fact inadequately trained its employees in the lawful execution of its duties, and second, that this failure to train was actually a city policy." *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1555 (11th Cir. 1989) (citations omitted). As the *Harris* Court observed, the city's policy of inadequate training "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris*,

19

489 U.S. at 388, 109 S.Ct. at 1204.  Deliberate indifference arises when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id*. at 390, 109 S.Ct. at 1205.  Moreover, plaintiff must establish that more than just one officer was inadequately trained:

> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcoming may have resulted from factors other than a faulty training program.  It may be, for example, that an otherwise sound program has occasionally been negligently administered.  Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. . . .  And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Id*. at 378, 109 S.Ct. at 1206.  Here, however, plaintiff has failed to provide any proof that the City of Scottsboro acted with deliberate indifference as to the training, supervision, or monitoring of its officers.  Indeed, the City of Scottsboro imposes upon its officers a hefty continuing education requirement, twice the minimum requirements of the State of Alabama.[42]  Although the

---

[42] Chief Smith testified as follows (Smith's deposition at 30):

[E]very police officer now is required to have a certain number of

City did not require preliminary training for Officer Whited, such a decision did not amount to deliberate indifference, especially considering Whited's prior experience as a police officer, his certification, and his record free of disciplinary blemish. *See Anderson v. City of Glenwood*, 893 F. Supp. 1086, 1090 (S.D. Ga. 1995) (holding that "the fact that an officer received most of his training through the State and not from his small town police force is not nearly enough to accuse that town of deliberate indifference to the needs of its citizenry") (citing *Cannon v. Taylor*, 782 F.2d 947, 951 (11th Cir. 1986); *Languirand v. Hayden*, 717 F.2d 220, 227-28 (5th Cir. 1983)). Furthermore, plaintiff has failed to point to a single prior incident involving this type of police conduct within the Scottsboro jail. Therefore, this claim also is due to be dismissed. *C.f. Kerr*, 875 F.2d at 1556 (evidence that city knew that apprehension of suspect by canine unit frequently resulted in injury to suspect sufficient to support jury verdict holding city liable); *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) (evidence of at least five prior incidents involving excessive force and testimony that police had no training on use of

---

hours a year training to stay certified and ... [for] most of my people I think it's ten hours that is required to maintain each year and my department requires twenty hours per officer, double what the State requires....

force sufficient to support verdict holding city liable).

Finally, plaintiff claims that Chief Smith is individually liable as a supervisor, because of his failure to adequately train and supervise. As with municipal liability, however, liability does not attach to supervisory personnel under § 1983 on a theory of respondeat superior. *Greason v. Kemp*, 891 F.2d 829, 836 (11th Cir. 1990). "A supervisor can be held liable under § 1983 when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff and his conduct was causally related to the constitutional violation committed by his subordinate." *McKinney v. DeKalb County*, 997 F.2d 1440, 1443 (11th Cir. 1993). To establish a claim of supervisory liability, plaintiff must demonstrate: "(1) whether, in failing adequately to train and supervise subordinates, [Chief Smith] was deliberately indifferent to an inmate's ... [needs]; (2) whether a reasonable person in the supervisor's position would know that his failure to train and supervise reflected deliberate indifference; and (3) whether his conduct was causally related to the constitutional infringement by his subordinate." *Greason*, 891 F.2d at 836. As previously discussed with regard to municipal liability, plaintiff has not

22

provided any proof that Chief Smith inadequately trained and supervised his officers, much less that such lack of training amounted to deliberate indifference. Thus, this claim also is due to be dismissed.

### b. Claims against Officer Whited

Plaintiff seeks damages from Officer Whited in his individual capacity for alleged violations of plaintiff's right to substantive due process, as guaranteed by the Fourteenth Amendment to the United States Constitution. Specifically, plaintiff alleges that Whited inflicted punishment on him, by pushing him "in the back with such force so as to cause him to strike the toilet thereby causing serious injuries."[43] Plaintiff avers that such action was unwarranted in light of these facts: he had not resisted arrest; there "were at least two or three police officers in the city jail with the Plaintiff when he was handcuffed"[44]; and he was intoxicated.

As a pretrial detainee at the time of the alleged incident, plaintiff's § 1983 claim properly arises under the Due Process Clause of the Fourteenth Amendment, instead of the Eighth Amendment's Cruel and Unusual Clause. *See Bell v. Wolfish*, 441

---

[43] Plaintiff's brief (doc. no. 20) ¶ 9.

[44] *Id.*

U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996). Under the Due Process Clause, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell*, 441 U.S. at 535, 99 S.Ct. at 1872. "A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment." *Id.* at 535 n. 16, *99* S.Ct. at 1872 n. 16. Nevertheless, "the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." *Cottrell*, 85 F.3d at 1490. This is because "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Bell*, 441 U.S. at 545, 99 S.Ct. at 1877.

There are two broad categories of cases that are actionable under the Fourteenth Amendment: complaints regarding detainees' conditions of confinement, *See Bell*, 441 U.S. at 541, 99 S.Ct. at 1875 (examining whether the confinement of two inmates in individual, single-occupancy rooms violated due process); *Cottrell*, 85 F.3d at 1490 (examining method in which arrestee was transported in police vehicle after his arrest under the Fourteenth Amendment);

24

and those alleging excessive use of force, *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (reviewing amount of force that prison guards may use to put down a riot under the Eighth and Fourteenth Amendments).  To prevail in a case alleging unconstitutional conditions of confinement, a detainee must show that the official acted with "'deliberate indifference' to a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994).  The Supreme Court has clarified, however, that the deliberate indifference standard should not be used in excessive force cases.

> That point underlies the ruling that "application of the deliberate indifference standard is inappropriate" in one class of prison cases: when "officials stand accused of using excessive physical force."  In such situations, where the decisions of prison officials are typically made "'in haste, under pressure, and frequently without the luxury of a second chance,'" <u>a ... claimant must show more than "indifference," deliberate or otherwise</u>.  <u>The claimant must show that officials applied force "maliciously and sadistically for the very purpose of causing harm," or, as the Court also put it, that officials used force with "a knowing willingness that [harm] occur</u>."

*Farmer*, 511 U.S. at 835-836, 114 S.Ct. at 1978 (citations omitted) (emphasis supplied).

In determining "whether force was applied in a good-faith effort to maintain or restore discipline[,] or maliciously and sadistically for the very purpose of causing harm," *Hudson v.*

*McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)), the court must examine "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7, 112 S.Ct. at 999 (citing *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085 (adopting the *Johnson* factors)); *see also O'Neal v. DeKalb County*, 850 F.2d 653, 656 (11th Cir. 1988) (applying the *Johnson* factors in a substantive due process context). The court may also consider "the extent of the injury suffered by the inmate," and a claim of excessive force may be established even if the victim does not suffer "serious" or "significant" injury, provided that the amount of force used is more than "de minimis," or involves force that is "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 7-10, 112 S.Ct. at 999-1001.

In the present case, the divergent factual accounts provided by the parties make it impossible for the court to resolve this issue at the summary judgment stage. First, the parties dispute the source of plaintiff's fractured ribs. Plaintiff contends that the

26

injury was a direct result of the shove he received from Whited. On the other hand, defendants contend that plaintiff injured himself by first standing on the edge of, and then slipping and falling into the toilet.[45]

Moreover, Officer Whited admits that he shoved plaintiff, but contends that such force was necessary because plaintiff was cursing him, attempting to strike him, and resisting placement in the drunk tank.[46]  In contrast, plaintiff contends that he was passively complying with Whited's directions and, thus, any use of force was unnecessary.  Additionally, even if plaintiff had been resisting arrest, Officer Whited had assistance from one of the jailers, Shane Clark, while another jailer (Fountain) and Sergeant Keller were standing just a few feet away.  Such force was unnecessary, therefore, in light of plaintiff's intoxicated condition, and the available personnel who stood ready to aid Whited should any trouble arise.

Thus viewing the facts in the light most favorable to plaintiff, it _was_ unreasonable for Officer Whited to perceive that plaintiff posed any threat or danger to his safety.  Plaintiff was handcuffed when he was escorted into the drunk tank, and he was accompanied at

---

[45] _See supra_ note 29.

[46] _Id._

27

all times by two city officials, Whited and Clark, with two additional officials nearby. Plaintiff did not struggle against being placed in the cell and, accordingly, the force applied by Whited was unreasonable. If the jury believes that plaintiff was injured by Whited's shove, instead of his own acrobatic endeavors, his injury is sufficiently significant to be protected by the Fourteenth Amendment. *See Hudson*, 503 U.S. at 10, 112 S.Ct. at 1000 (holding that plaintiff did not suffer a de minimis injury because he suffered bruises, swelling, loosened teeth and a cracked dental plate); *see also Telfair v. Gilberg*, 868 F. Supp. 1396, 1413 (S.D. Ga. 1994) (concluding that an issue of material fact existed as to plaintiff's due process claim because "it is difficult for this Court to believe that a pretrial detainee with a prosthetic hip replacement presented three prison guards with such a threat as to justify choking him and then later pushing the disabled inmate to the floor of a cell"). Summary judgment on this claim will be denied.

### 2. Deliberate indifference to serious medical needs

Plaintiff alleges in Count IV of his complaint that defendants "intentionally and deliberately with[eld] medical care" and "negligently and/or wantonly and/or intentionally ... with[eld]

medical treatment from the Plaintiff."[47]  The court construes these allegations as a claim that defendants were deliberately indifferent to his medical needs in violation of the Fourteenth Amendment.

The due process clause of the Fourteenth Amendment requires "the responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police." *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605, 611 (1983).  The Eleventh Circuit equates the due process analysis for pretrial detainees with that which applies to convicted prisoners under the Eighth Amendment. *See Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1186 n.19 (11th Cir. 1994) ("our circuit has determined that 'in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care[,] the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons.'" (internal citation omitted)).

In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court established the "deliberate indifference"

---

[47] Complaint at 10.

standard for determining when the failure to provide medical care to incarcerated prisoners rises to the level of a constitutional claim.   The Court elaborated on what is required to prove deliberate indifference in *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994):

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ... An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.  The common law reflects such concerns when it imposes tort liability on a purely objective basis.  But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id.* at 837-38, 114 S.Ct. at 1979 (citations omitted).  Viewing the Eighth Amendment standards of *Estell* and *Farmer* through the refractive lens of the Fourteenth Amendment, a pretrial detainee alleging deliberate indifference to serious medical needs must prove not only knowledge by jail or police officials of a substantial risk of serious harm, but also deliberate disregard of that risk.   *See Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir.

1999).  "Proof that the defendant should have perceived the risk, but did not, is insufficient." *Id.* (citation omitted).     Prison and jail officials may exhibit deliberate indifference by <u>delaying</u> access to medical attention, *Estelle*, 429 U.S. at 104-05, 97 S.Ct. at 291, as well as by <u>failing</u> to treat an inmate or pretrial detainee.  *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999).  "[D]enial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency...."  *Estelle*, 429 U.S. at 103-04, 97 S.Ct. at 290.  The standard announced in *Estelle* thus is three-pronged and requires:  "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

Here, there is sufficient evidence that Officer Whited and Jailer Denise Fountain possessed subjective knowledge that plaintiff was experiencing pain, but intentionally disregarded his complaints for approximately two hours, before transporting him to the hospital for treatment.  Plaintiff testified, as follows:

Q.     What did you do after you hit the toilet?

31

A.      I rolled.  I just stayed in a ball and couldn't move.
. . .
Q.      Did you yell out that you were hurt?

A.      Yes, sir.

Q.      What did you say?

A.      I said I needed help.  I need help.

Q.      And what did they do?

A.      Ignored it.

Q.      They just walked out?

A.      Yes, sir.   And Ms. Fountain looked at [Officer
        Whited] and said: What did you do that for?
. . .
Q.      What happened next after that, after they walked out?

A.      Well, I just laid there and hollering and screaming
        for help for somebody to come back there.  And after
        probably an hour and a half or so, Ms. Fountain come
        back there and looked at me still laying in the same
        position and she went back up front and said:  He
        needs help.  But when ... it first happened, Whited
        went back up front and he was up there laughing about
        it.  He thought it was funny.

Q.      You heard him laughing?

A.      Yes, sir.[48]

The next question, therefore, is whether plaintiff was suffering

from a <u>serious</u> medical need.  Although the Supreme Court has not

defined the term "serious medical need," the Eleventh Circuit has

determined that "[a] 'serious' medical need is one that has been

---

[48] Plaintiff's deposition at 100-01.

diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."   *Hill*, 40 F.3d at 1187 (internal quotation omitted).   This circuit has clearly established that injuries such as broken bones are sufficiently serious to warrant immediate attention.[49]   *See Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990) (broken foot is a serious medical need);   *Hughes v. Noble*, 295 F.2d 495 (5th Cir. 1961) (broken and dislocated cervical vertebrae is a serious medical need).

The next issue is whether a two hour delay in transporting plaintiff to the hospital for medical examination and treatment is actionable.   Binding authority compels the conclusion that it is.

---

[49] When the seriousness of the injury has not been clearly established by prior case law, the determination "may be decided by reference to the effect of delay in treatment."   *Hill*, 40 F.3d at 1188 (emphasis supplied).   Under this analysis, plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment."   The detrimental effect of the delay is not the only consideration, however.   Rather, "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay."   *Id.* at 1189.   Because the Eleventh Circuit previously established the seriousness of injuries such as broken bones, and the desire to avoid the infliction of unnecessary pain caused by any delay in treatment, the court declines to find this factor determinative.   *See H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1086-87 (11th Cir. 1986) (finding delay in treating plaintiff's shoulder injury amounted to a constitutional violation, but noting that after an initial hospital visit "[n]o further medical treatment was needed and [plaintiff] did not suffer permanent physical scarring"); *Aldridge v. Montgomery*, 753 F.2d 970, 973 (11th Cir. 1985) (noting that plaintiff's "sutures were removed and there was never any infection of the cut," but finding that plaintiff's deliberate indifference claim should have been submitted to the jury because officials delayed two and a half hours before obtaining medical treatment for plaintiff).

> The tolerable length of delay in providing medical attention
> depends on the nature of the medical need and the reason for
> the delay. <u>A few hours' delay in receiving medical care for
> emergency needs such as broken bones and bleeding cuts may
> constitute deliberate indifference</u>. Delayed treatment for
> injuries that are of a lesser degree of immediacy than
> broken bones and bleeding cuts, but that are obvious serious
> medical needs, may also give rise to constitutional claims.

*Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994)

(emphasis supplied). For instance, in *Brown*, the Eleventh Circuit

held that a six hour delay in treating an inmate's broken foot

provided the basis for an Eighth Amendment violation.

> With this type of injury, it may be that deliberately
> indifferent delay, no matter how brief, would render
> defendants liable as if they had inflicted the pain
> themselves. Deliberately inflicted pain, as with an
> electric cattle prod, does not become unimportant and
> unactionable under the eighth amendment simply because the
> pain produced is only momentary. Even if we were to
> recognize as de minimus delays of a few seconds or minutes,
> a deliberate delay on the order of hours in providing care
> for a serious and painful broken foot is sufficient to state
> a constitutional claim.

894 F.2d at 1538; *see also Aldridge v. Montgomery*, 753 F.2d 970,

973 (11th Cir. 1985) (concluding that a pretrial detainee's

deliberate indifference claim should be submitted to the jury,

based on the fact that he received a one and a half inch cut above

his right eye and prison officials ignored the bleeding for

approximately two hours); *Hughes*, 295 F.2d at 496 (finding that a

thirteen hour delay for a broken and dislocated cervical vertebrae

was actionable).  Accordingly, the court concludes that plaintiff's deliberate indifference claim is due to be submitted to the jury. The only remaining issue is which party (or parties) should be exposed to potential liability.

To recover individually against Chief Smith, plaintiff must show that he is "liable either through [his] 'personal participation' in the acts comprising the alleged constitutional violation or 'the existence of a causal connection' linking [his] actions with the violation."  *Hill*, 40 F.3d at 1192 (internal citation omitted). Supervisors also may be liable "if they personally instigated or adopted a policy that violated [plaintiff's] constitutional rights."  Here, however, Chief Smith was not present at the jail when the assault occurred.  Nor is there any proof that he had adopted a policy that promoted delay in seeking medical care for plaintiff's injury.  Thus, this claim is due to be dismissed as to him.

Moreover, there is no evidence that a city or departmental policy or custom "is responsible for 'inflict[ing] the injury,' and thus is 'the moving force of the constitutional violation.'"  *Id*. at 1195.  To establish deliberate indifference on the part of the city, plaintiff had to show that "a policy of deficiencies in

staffing or procedures such that the inmate is effectively denied access to adequate medical care." *Id.* (citing *Anderson v. City of Atlanta*, 778 F.2d 678, 687 n.12 (11th Cir. 1990). Plaintiff has not alleged (much less established)that the city had any staffing problems, or identified other instances where the city was deliberately indifferent to an inmate's serious medical needs. "[A] 'single incident' is an insufficient basis for governmental liability under section 1983," *Hill*, 40 F.3d at 1196 (internal citation omitted). Therefore, plaintiff has failed to show the liability of the City of Scottsboro. Accordingly, this claim will proceed solely against Officer Whited, because Whited had knowledge of plaintiff's injury, but failed to assist him.

## B. Plaintiff's State Law Claims of Outrage and Assault and Battery

In count three of his complaint, plaintiff contends that defendants' conduct "was so outrageous in character and so extreme in degree so as to go beyond all bounds of decency and shock the conscious of a civilized society."[50] Plaintiff also accuses Officer Whited in count four of "intentionally and deliberate[ly]" assaulting him.[51] He avers that Chief Smith and the City of Scottsboro should be vicariously liable for Whited's conduct,

---

[50] Complaint at 8.

[51] *Id.* at 9.

because they "negligently and/or wantonly conducted themselves so as to cause or permit the Plaintiff ... to be physically abused and battered."[52]

### 1.   Outrage

To establish a claim of outrage under Alabama law, plaintiff must show:  "(1) that the defendant's conduct was intentional or reckless;  (2) that it was extreme and outrageous;  and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." *Ex parte Crawford & Co.*, 693 So.2d 458, 460 (Ala. 1997).   The Alabama Supreme Court elaborated on the second element as follows:  "[b]y extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Service Co. v. Immon*, 394 So. 2d 361, 365 (Ala. 1981) (internal citation omitted).   Thus, a claim of outrage can be permitted to proceed to a jury "only in egregious cases." *Ex parte Crawford*, 693 So. 2d at 460.   Indeed, "the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances." *Thomas v. BSE Industrial Contractors, Inc.*, 624 So. 2d 1041, 1044

---

[52] *Id.*

37

(Ala. 1993). The Alabama Supreme Court has concluded "in a large majority of the outrage cases ... that no jury question was presented." *Id.*

> In fact, in the 12 years since Immon was decided, all cases in which this Court has found a jury question on an outrage claim have fallen within only three categories: 1) cases having to do with wrongful conduct in the context of family burials, 2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim, and 3) a case involving egregious sexual harassment.

*Id.* (internal citations omitted).

Given the limited nature of this cause of action, defendants' conduct does not rise to the level of an "outrage," as that tort is defined under Alabama law. This conclusion is consistent with the holding in *Newton v. Columbia*, 695 So. 2d 1213, 1218 (Ala. Civ. App. 1997) (affirming the dismissal of an outrage claim pled against a police officer, because it "does not meet the stringent standard of outrageous and extreme conduct adopted by our supreme court," but acknowledging that the officer's conduct "may amount to an assault, or to a violation of [plaintiff's] constitutional rights"). Accordingly, this claim is due to be dismissed.

## 2.    Assault

The Alabama Supreme Court has defined an assault as:

an intentional, unlawful offer to touch the person of
another in a rude or angry manner under such circumstances
as to create in the mind of the party alleging the assault
a wellfounded fear of an imminent battery, coupled with the
apparent present ability to effectuate the attempt, if not
prevented.

*Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990) (citations and

internal quotation marks omitted). "A successful assault becomes

a battery, which consists of the touching of another in a hostile

manner." *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995) (citing

*Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala. 1986)).

To determine whether plaintiff has a viable assault claim, this

court must examine the doctrine of discretionary function immunity,

defined by Alabama Code § 6-5-338(a):

Every peace officer, except constables, who is employed or
appointed pursuant to the Constitution or statutes of this
state, whether appointed or employed as such peace officer
by the state or a county or municipality thereof, ... and
whose duties prescribed by law, or by the lawful terms of
their employment or appointment, include the enforcement of,
or the investigation and reporting of violations of, the
criminal laws of this state, and who is empowered by the
laws of this state to execute warrants, to arrest and to
take into custody persons who violate, or who are lawfully
charged by warrant, indictment, or other lawful process,
with violations of, the criminal laws of this state, shall
at all times be deemed to be officers of this state, <u>and as
such shall have immunity from tort liability arising out of
his or her conduct in performance of any discretionary
function within the line and scope of his or her law
enforcement duties</u>. [emphasis supplied.]

The Alabama Supreme Court recently interpreted this statute as

insulating municipal police officers from tort liability, "unless the officer's conduct is so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith." *Couch v. City of Sheffield*, 708 So.2d 144, 153 (Ala. 1998).

This court must first examine whether Officer Whited was engaged in the performance of a discretionary function at the time the alleged tort occurred. *See Sheth v. Webster*, 145 F.3d 1231, 1239 (11th Cir. 1998). The Alabama Supreme Court has defined "discretionary acts" as those

> acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances.

*Wright v. Wynn*, 682 So.2d 1, 2 (Ala. 1996). If Officer Whited was engaged in a discretionary act, the burden shifts to plaintiff to demonstrate that Whited acted in bad faith, with malice or willfulness, in order to deny defendants immunity. *Sheth*, 145 F.3d at 1239. (The Alabama Supreme Court has held that acts committed willfully, with malice or bad faith, will not be considered discretionary in nature. *See Couch*, 708 So. 2d at 153.)

Due to material factual disputes, namely the manner and circumstances under which plaintiff was injured, the court cannot determine as a matter of law that plaintiff's assault claim against

Officer Whited is due to be dismissed on the grounds of discretionary function immunity. There cannot be any doubt that Whited's touching of plaintiff was hostile and undesired by plaintiff. That concern is irrelevant, however, if the touching was justified in the performance of Whited's official duties as a police officer. Because the parties dispute whether the touching was justified under the circumstances, summary judgment is due to be denied. If Whited intentionally pushed plaintiff, without provocation, and with such force as to cause him to fracture three ribs, such conduct is not entitled to immunity. *See Sheth*, 145 F.3d at 1239-40 (affirming the denial of discretionary function immunity to arresting officer because an issue of fact existed as to whether the officer "acted maliciously, willfully or in bad faith").

As a final matter, the court notes that defendants Smith and the City of Scottsboro offer independent arguments for the dismissal of plaintiff's assault claim.

> Nor is there any evidence in support of the allegations that Chief Smith or the City of Scottsboro allowed an assault and battery to occur. There had been no prior misconduct by Officer Whited, and Chief Smith admitted to having disciplined officers for use of excessive force. The plaintiff has not shown any policy of the City of Scottsboro encouraging the officers to assault and batter arrestees. In short, there is simply no evidence tending to show in any way that Chief Smith or the City of Scottsboro contributed

41

to an assault and battery of McIllwain.[53]

Although the court agrees that the claims asserted against Chief Smith are unfounded,[54] the City of Scottsboro's liability is a more difficult issue.

The liability of a municipality for the negligent acts of its agents, officers, or employees is governed by Alabama Code § 11-47-190.  That section provides, in part:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless said <u>injury</u> or wrong <u>was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality</u> engaged in work therefor and while acting in the line of his or her duty....

Alabama Code § 11-47-190 (emphasis supplied).  In *Birmingham v. Thompson*, 404 So. 2d 589 (Ala. 1981), the Alabama Supreme Court construed that statute in the context of an assault claim, and concluded that § 11-47-190 does not absolve municipalities from liability for the tort of assault and battery committed by their

---

[53] Defendants' brief (doc. no. 18) at 19.

[54] In summary, the court finds that summary judgment is due to be granted on plaintiff's outrage and assault claims asserted against Chief Smith.  Chief Smith is sued in his individual capacity, and the Alabama Supreme Court has recognized that "[c]ity officials acting within the general scope of their authority have a qualified or discretionary immunity and are not subject to tort liability for an administrative act or omission." *Ex parte City of Birmingham*, 624 So. 2d 1018, 1021 (Ala. 1993).  Smith's decision to hire Whited, and his decision not to provide him with any initial training due to his previous experience, are acts that fall within his discretionary authority.  Plaintiff has not provided the court with any evidence that these decisions were made in "bad faith, with malice or willfulness."

42

officers.   In *Thompson*, the plaintiff alleged that, while he was incarcerated in the city jail, he was beaten by a police officer for refusing to change into a prison uniform.   404 So. 2d at 589. The Alabama Supreme Court concluded that Alabama recognizes the concept of a "negligent assault and battery," and that the case against the city was properly submitted to the jury because the city's officer was obviously "unskilled" in the use of excessive force.

> This case was submitted to the jury on the theory that an agent of the City of Birmingham had used "excessive force" upon the plaintiff, that is, a force which was excessive. That is the equivalent of asserting an assault and battery not measured or patterned for the circumstances, or an unskilled response, whether the force used was, as the trial court charged, exerted because of the plaintiff's failure to respond to an order, or because the force was exerted in meeting a counterforce of the plaintiff.   In either case, the lack of a response measured by the circumstances could have been due to his "unskillfulness" as an officer confronted by either of those circumstances.   As "unskillful" is used in § 11-47-190, it means "lacking in skill or proficiency."   An assault and battery committed under either circumstance, because "unskilled," would be a negligent assault and battery because it would fall below that response which a skilled or proficient officer would exercise in similar circumstances.   Hence, the cause of action alleged and proved fell within the conduct for which the legislature has prescribed a remedy under § 11-47-190.

*Id.* at 591.   This construction of the statute was affirmed in a recent decision of the Alabama Supreme Court, *See Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995), holding that it was

43

"improper" for the trial court to dismiss plaintiff's assault and battery claim against the city.  In so ruling, the court noted that there was an "unresolved dispute" over whether the force used by the officer was excessive, or whether it was justified in light of the plaintiff's conduct.[55]

> [T]he motion for summary judgment should have been granted only if [plaintiff] presented no substantial evidence to create a genuine issue of material fact as to whether probable cause existed to make a lawful arrest or as to whether the force used was excessive.

*Id.*  The effect of these two holdings is to impose vicarious liability on municipalities for torts committed by their agents, as long as the torts that are committed are not intentional.  *See Altmayer v. City of Daphne*, 613 So. 2d 366, 369 (Ala. 1993) (holding that "a municipality [is absolved] from liability for the intentional torts of its agents").  In light of the foregoing precedent, the court declines to dismiss the City of Scottsboro from this action.

### IV.  CONCLUSION

Based on the foregoing, defendants' motion for summary judgment is due to be granted in part and denied in part.  An order

---

[55] The officer testified that plaintiff "cursed him and was speaking in a loud voice and was attracting the attention of the other spectators in the stands." 670 So. 2d at 853. Plaintiff "denies cursing the officer or otherwise acting in a manner constituting disorderly conduct." *Id.*

44

consistent   with   this   memorandum   opinion   will   be   entered
contemporaneously herewith.

    **DONE** this _13th_ day of April, 2000.

                                              United States District Judge

45